FILED'05 MAR 06 10:06USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

M.N.O.,                                  )
                                         )
      Plaintiff,                     )    Civil Nos.    03-6393-TC
                                         )                  04-1021-TC
      v.                             )                  04-6017-TC
                                         )                  04-6018-TC
ROGER EUGENE MAGANA and                  )                  04-6183-TC
CITY OF EUGENE,                          )                  04-6443-TC
                                         )
      Defendants.                    )    OPINION AND ORDER
_____  )
                                         )
LISA DUNN,                               )
                                         )
      Plaintiff,                     )
                                         )
      v.                             )
                                         )
ROGER EUGENE MAGANA and                  )
CITY OF EUGENE,                          )
                                         )
      Defendants.                    )
_____  )

1 - OPINION AND ORDER

J.E.B.,                                        )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )
                                               )
ROGER EUGENE MAGANA and                        )
CITY OF EUGENE,                                )
                                               )
          Defendants.                          )
_____)
                                               )
T.L.L.,                                        )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )
                                               )
ROGER EUGENE MAGANA and                        )
CITY OF EUGENE,                                )
                                               )
          Defendants.                          )
_____)
                                               )
S.A.L.,                                        )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )
                                               )
JUAN FRANCISCO LARA and                        )
CITY OF EUGENE,                                )
                                               )
          Defendants.                          )
_____)
                                               )
J.R.,                                          )
                                               )
          Plaintiff,                           )
                                               )
     v.                                        )
                                               )
CITY OF EUGENE,                                )

2 - OPINION AND ORDER

        )
    Defendant.        )
_____)

COFFIN, Magistrate Judge.

Presently before the court are defendant City of Eugene's motions for summary judgment, and plaintiff Dunn's motion for summary judgment in her favor on all state law claims.[1]

## BACKGROUND

The specific factual allegations at issue in these cases is amply described in the parties' briefing, and will not be recounted here save as necessary below for specific portions of the court's analysis. Suffice it to say that plaintiffs allege in their respective complaints that they are among the victims of former City of Eugene police officers Roger Magana and Juan Lara, who, after a high profile investigation, were terminated from their positions and were thereafter convicted of various criminal offenses for leveraging their positions of authority as police officers to sexually assault and abuse numerous women. The plaintiffs, as described in more detail below, variously bring claims against the City of Eugene and officers Magana and Lara, alleging violations of their federal constitutional rights and their rights under state law. Defendant City of Eugene ("City" or "the defendant")[2] seeks summary judgment on all claims against it, arguing that various statutes of

_____

[1] I note that there is a significant question as to whether Dunn adequately notified the City of Eugene of her intent to sue, as required by the Oregon Tort Claim Act. See ORS 30.275. As discussed below, I will allow plaintiff to make a showing at trial that such notice was given; however, given that her state law claims may fail for want of proper OTCA notice, it would be inappropriate to consider granting her summary judgment on those claims. Further, construing the facts in the light most favorable to the City (as the non-moving party), I find that there are factual issues which would have to be considered by a jury in any event. Therefore, plaintiff Dunn's motion for partial summary judgment is denied.

[2] All references to "defendant" or "the defendant" in this opinion refer to defendant City of Eugene unless otherwise specified.

3 - OPINION AND ORDER

limitation expired prior to plaintiffs' filing their complaints; that plaintiffs failed to comply with the notice provisions of the Oregon Tort Claims Act; that plaintiffs cannot maintain claims against the City on a <u>Monell</u> theory;[3] and that state law prohibits imposing municipal liability under the circumstances presented in these cases.

## STANDARD OF REVIEW

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); <u>Bahn v. NME Hosp's, Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party must carry the initial burden of proof. This burden is met through identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. <u>Id.</u> The facts on which the opponent relies must be admissible at trial, although they need not be presented in admissible form for the purposes of opposing the summary judgment motion. <u>Id.</u>

The court must view the evidence in the light most favorable to the nonmoving party. <u>Bell v. Cameron Meadows Land Co.</u>, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. <u>Hector v. Wiens</u>, 533 F.2d 429, 432 (9th Cir. 1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Valadingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989). Where different ultimate inferences may be drawn, summary judgment

─────────────────────────

[3]<u>Monell v. Dept. of Social Services of City of New York</u>, 436 U.S. 658 (1978).

4 - OPINION AND ORDER

is inappropriate.  Sankovich v. Insurance Co. Of North America, 638 F.2d 136, 140 (9th Cir. 1981).

Deference to the non-moving party does have some limit.  The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added).  Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 587 (1986).  The "mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 252 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Id. at 248.  However, trial courts should act with caution in granting summary judgment, and may deny summary judgment "in a case where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## DISCUSSION

**I.    Plaintiffs' federal claims under 42 U.S.C. § 1983[4]**

    **A.    Statutes of limitations issues**

The limitations period for a claim brought under § 1983 tracks relevant state statutes of limitations, and in Oregon such a claim must be brought within two years of the occurrence of the event complained of.  Sain v. City of Bend, 309 F.3d 1134, 1139 (9th Cir. 2002); Davis v. Harvey, 789 F.2d 1332 (9th Cir. 1986); see also ORS 12.110(1).  The limitations clock begins to run when the plaintiff knows or has reason to know of the injury forming the basis of the action.  Azer v.

---

[4]Some plaintiffs filed actions against the Eugene Police Department as well as the City of Eugene and individual defendants.  Because the Eugene Police Department is not a "person" under § 1983, it cannot be sued, although the City of Eugene can be subject to municipal liability.  See Hervey v. Estes, 65 F.3d 784, 791-92 (9th Cir. 1995).  The Eugene Police Department is dismissed as a defendant from any § 1983 claims brought by the plaintiffs.

Connell, 306 F.3d 930, 936 (9th Cir. 2002). However, in limited circumstances, application of the judicially-crafted doctrine of equitable estoppel may be appropriate to extend the limitations period. When applied to a § 1983 claim, questions of tolling by estoppel are also governed by state law. Wilson v. Garcia, 471 U.S. 261, 276 (1985); Two Rivers v. Lewis, 174 F.3d 987, 992 (9th Cir. 1998). Although there is a dearth of Oregon cases on the specific question presented by the plaintiffs here (to wit, whether equitable estoppel should apply when a police officer, who causes the injury underlying the claim, has engendered such fear in the potential plaintiff as to cause that person to fail to file a timely complaint), Oregon courts do allow equitable estoppel in cases of misconduct by a defendant which induces the plaintiff to miss the deadline. See, e.g., Gehrke v. CrafCo, Inc., 143 Or.App. 517, 525 (1996). Other jurisdictions, however, have addressed the issue squarely before this court, and have concluded that equitable estoppel is available where the plaintiff can demonstrate that: (1) the defendant made specific promises, threats or inducements that prevented the plaintiff from filing suit; (2) those promises, threats or inducements actually caused the plaintiff to forbear filing the lawsuit; (3) the forbearance was reasonable; and (4) the plaintiff filed suit within a reasonable time after termination of the conduct causing such forbearance. See, e.g., Nolde v. Frankie, 192 Ariz. 276, 279-81 (1998); John R. v. Oakland Unified School Dist., 48 Cal.3d 438, 443-46 (1989).

In an earlier case, this court has considered a similar question: whether the threats of a police officer tortfeasor can suffice to allow a court to estop the defendant from asserting that the plaintiff's failure to provide required notice under the Oregon Tort Claims Act barred her from maintaining state law claims against the officer's municipal employer. J.S. v. City of Eugene, Civ.No. 04-6320-TC (D.Or. 2005). In that case, the court determined that even though the OTCA notice period is a

jurisdictional prerequisite to suit, as opposed to a statute of limitations, direct threats to the safety

of the plaintiff, made by a police officer tortfeasor, which are designed to, and in fact do, prevent

plaintiff from timely filing her OTCA notice will suffice to toll the notice period.  This court finds

the same analysis appropriate to plaintiffs' claims of equitable estoppel on their § 1983 claims.  As

such, the court will allow a jury to consider the doctrine of equitable estoppel related to plaintiffs'

claims which, although filed outside the two year statute of limitations, have sufficient evidence to

allow a reasonable factfinder to conclude that they were untimely filed because of plaintiffs'

reasonable forbearance from filing based on direct threats by Magana or Lara to the safety of the

plaintiff.  A so called "natural fear" of retribution is insufficient to meet that standard.[5]  But where

Magana or Lara directly threatened physical harm to a plaintiff if she instigated an action against

him, a jury could conclude that defendants must be estopped from asserting a statute of limitations

bar to suit.[6]

      1.    **M.N.O.**

---

[5]In other words, a fear premised solely on the fact that Magana and Lara were police officers.

[6]Plaintiffs' descriptions of events causing them fear or concern are taken from their affidavits and depositions.  Although defendant argues that to the extent an affidavit is inconsistent with a deposition, the court should disregard the contrary portions of the affidavit, I disagree.  That someone fails to recollect something on one occasion but remembers it on another does not mean one statement is per se more accurate than the other.  Further, as all counsel no doubt agree, different statements on the same topic can be gleaned by asking different questions.  For example, a witness testifying on direct examination may say something straightforward, which is then undermined by questions asked for the purpose on cross examination, and then possibly reaffirmed on re-direct.  In such a case, the jury, as factfinder, would evaluate the credibility of the witnesses based on the factors available to it, such as the manner and demeanor of the witness while testifying, corroborating evidence, and its determinations as to the accuracy of other issues the witness has testified to.  In any event, to the extent I find the existence of sufficient facts which, if proven, would allow invocation of equitable estoppel, thus allowing the claim to survive summary judgment on statute of limitation grounds, a jury will need to decide whether those facts are true and whether the doctrine thus applies.

7 - OPINION AND ORDER

Plaintiff M.N.O. brings claims based on actions of Magana occurring from summer 2000 to 2003.  She filed her suit on December 16, 2003.  As such, defendant argues that all § 1983 claims based on actions taken by Magana prior to December 16, 2001 are barred by the statute of limitations.

I find that a jury could conclude that equitable estoppel is appropriate in M.N.O.'s case.  She states that Magana informed her that he could find her at any time, locate her family, and arrest her any time he wanted to.  He verbally threatened that she would "pay" if she talked about him to others. And, most importantly, she states that on at least two occasions Magana, in the course of driving by her in his patrol car, pointed his finger at her and simulated a pistol firing at her.  I find that this admittedly non-verbal action was a direct threat to M.N.O. that if she reported his activities in any way he would cause her bodily harm, particularly when considered with his verbal comments.  Her delay in taking formal action against Magana until after his arrest in the fall of 2003 was reasonable given the circumstances of such threats.  The City is thus precluded from asserting the two-year statute of limitations on M.N.O.'s § 1983 claims at summary judgment.

### 2. **Dunn**

Plaintiff Dunn brings claims based on actions of Magana occurring from December 30, 2001 to June 15, 2003.  She filed her suit on July 27, 2004.  As such, defendant argues that all § 1983 claims based on actions taken by Magana prior to July 28, 2002 are barred by the statute of limitations.

To the best of the court's understanding, plaintiff Dunn has not provided argument on

defendant's statute of limitations argument on her § 1983 claims.[7]  However, she has made arguments against application of the two-year statute of limitations on her state claims, and the 180-day notice requirement of the OTCA, and seeks equitable estoppel at least as against the OTCA notice requirement.  Because evidence of Magana's conduct that may have caused her to forbear filing her lawsuit is available, the court will consider it in its evaluation.

The only specific direct threat by Magana that plaintiff has provided occurred during an arrest Magana made of plaintiff on February 9, 2003, when Magana allegedly threatened that he would kill plaintiff if she told other officers about his conduct.  However, it is clear from plaintiff's other testimony that this did not, in fact, deter her from telling multiple people, including other city police officers, members of the city Human Rights Commission, and her elected representatives that Magana was abusing her.[8]  No reasonable jury could conclude that Magana's threat actually prevented plaintiff from timely filing her suit.  As such, I find that the two-year statute of limitations applicable to § 1983 actions applies, and plaintiff's claims stemming from actions taken prior to July 28, 2002 are time barred.

## C.    J.E.B.

Plaintiff J.E.B. brings claims based on actions of Magana occurring in October 2001 and in May 2003.  She filed her suit on January 9, 2004.  Defendant thus argues that J.E.B.'s § 1983 claims based on actions taken by Magana in October 2001 are barred by the statute of limitations.

I agree with defendant.  Although plaintiff alleges that Magana was abusive to her and that

---

[7]Indeed, defendant also notes that it believes plaintiff "concedes" the bar to "some of plaintiff's claims[.]"  Reply Memorandum (#108) at 3.

[8]As noted, in order to invoke equitable estoppel, a plaintiff must establish not just that threats were made, but also that the threats caused the plaintiff to forebear filing a claim.

9 - OPINION AND ORDER

she was scared that he would arrest her or take some retribution if she reported his actions, she does not provide evidence that Magana directly threatened her. She notes that he spoke to her in a threatening tone when asking her whether she was going to tell anyone about what happened, thus implying that she should not, but such is not the specific sort of threat which would warrant estoppel. And although she notes that she was scared during the May 2003 encounter, in which Magana used his handcuffs on plaintiff and took out his firearm, a full reading of her affidavit on those issues shows that she does not allege that Magana did so to threaten her but because having her wear the handcuffs and having her touch his firearm "were somehow sexually exciting to him." Nowhere in her affidavit does plaintiff suggest that Magana used his gun to enforce her silence or threatened that she was in physical danger if she filed suit. No reasonable jury could conclude that defendant should be estopped from asserting the statute of limitations bar as to the October 2001 occurrence.

**B.**   **Color of law**

In order for a plaintiff to successfully prosecute a claim under § 1983, the defendant's actions resulting in the injury complained of must have been performed under color of law. 42 U.S.C. § 1983; Van Ort v. Estate of Stanewich, 92 F.3d 831, 835-40 (9th Cir. 1996). Defendant argues that several of plaintiffs' § 1983 claims must be dismissed because the alleged tortfeasor was not acting under color of law.

**1.**   **M.N.O.**

Defendant argues that because Magana was pursuing his own goals during the assaults alleged by M.N.O., he was not acting under color of law, and consequently her § 1983 claims must fail. I disagree. Although the Ninth Circuit has noted that "Acts committed by a police officer even while on duty and in uniform are not under color of law unless they are in some way related to the

performance of police duties," <u>Van Ort</u>, <u>supra</u>, it is also well established that a person acts under color of law if he "exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." <u>Dang Vang v. Vang Xiong X. Toyed</u>, 944 F.2d 476, 479 (9th Cir. 1991). It is clear that but for the power of authority Magana possessed by virtue of his uniform and patrol vehicle, he would not have been able to stop M.N.O. to initiate the alleged assaults. The dicta in <u>Van Ort</u> is inapplicable here where, although fueled by personal desires, Magana's actions against M.N.O. were made possible only because of his position as an on-duty police officer.[9]

### 2.    J.E.B.

Defendant argues that during the May 2003 event complained of by J.E.B., Magana was acting in his private capacity as a citizen and was not acting under color of law. During that event, Magana was in plainclothes, was apparently off duty, and drove his personal vehicle to J.E.B's residence. As such, defendant suggests that the finding in <u>Van Ort</u>, <u>supra</u>, in which the Ninth Circuit concluded that an officer who robbed a family was not acting under color of law when he broke in to their residence while off-duty, not in uniform, and in his personal vehicle, is controlling. However, the facts here are materially different than in <u>Van Ort</u>. Here, plaintiff's initial contact with Magana was made by Magana when he was in uniform and on duty, driving his patrol car, and in that setting he allegedly sexually assaulted J.E.B. Although he may have been off duty during the May 2003 event, Magana informed her that he was there to discuss a police investigation, and he had his

_____

[9]In each and every case of rape or sexual assault perpetrated by a police officer who encounters the victim while on duty and in uniform, it is obvious that the officer is pursuing his own illegal goals. That does not remove the violation from the "under color of law" rubric. A police officer who abuses his authority is still acting under the <u>color</u> of the law.

11 - OPINION AND ORDER

handcuffs and police firearm on him, which played a prominent role in the events that plaintiff alleged occurred. Under these facts, and viewing them in the light most favorable to plaintiff, I cannot say that Magana was not acting under color of law during the May 2003 event.

### 3.   S.A.L.

Defendant argues that on none of the three occasions in which S.A.L. alleges Lara violated her constitutional rights was Lara acting under color of law. As was the case described above with M.N.O., however, although Lara was acting in furtherance of his own personal goals, he did so, at least in regards to the February and March 2003 events, while in uniform and in a patrol car. The initiation of each of these events had the indicia of official police business, following which he allegedly coerced S.A.L. into the unwanted sexual activities. As to the May 2003 trespass, it is disputed whether the individual seen by S.A.L. on her property was Lara. However, whether it was Lara and whether he was acting under color of law while he was there, if he was, is a question of fact which must be resolved by the jury.[10] Defendant's argument that as a matter of law Lara was not acting under color of law during these events must fail.

### 4.   J.R.

Defendant argues that Lara was not acting under color of law during the May 3, 2003 encounter between Lara and J.R. underlying her § 1983 claim. Again, this argument fails. J.R.'s initial contact with Lara occurred as a result of official police business, after which he gave her his business card and asked to check in on her from time to time. Subsequent contacts between them occurred following J.R. contacting Lara or the Eugene Police Department to report possible criminal

---

[10]It is unclear whether plaintiff is alleging a deprivation of a constitutional right in connection with the trespass and, if so, the precise nature of the right at issue. As defendant's motion is based only on the "color of law" element, I will not address such other issues.

activity, and he responded variously on or off duty. Lara also came to her apartment unannounced, while on duty, to "check in" on her. On May 3, 2003, Lara went to J.R.'s apartment after she left a voicemail for him, the intent of which is disputed. He arrived in uniform while on duty, and the alleged assault occurred. I find that a jury question exists as to whether his presence at that point, given all the circumstances, was under color of law or not.

### C.    Constitutional violation

A fundamental requirement of a § 1983 claim is a cognizable constitutional injury. 42 U.S.C. § 1983. Defendant alleges that plaintiff S.A.L.'s allegation that Lara engaged in unwanted surveillance of her fails to meet this requirement. S.A.L. does not specifically address this contention in her response, and there does not appear to be any basis for asserting that such surveillance was itself a constitutional violation. Therefore, to the extent a § 1983 claim is based on Lara's alleged improper surveillance of plaintiff S.A.L., summary judgment on that aspect of the claim is granted in favor of defendant.

### D.    Monell liability

Pursuant to Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978), a municipality can be held liable under § 1983 only for injuries inflicted pursuant to a municipal policy or custom which caused the deprivations of a plaintiff's constitutional rights. Id. at 694. A municipality cannot be held liable on a simple theory of respondeat superior. Id. at 692. "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." Id. at 694. Defendant asserts that plaintiffs have failed to demonstrate that such policies or customs existed in the Eugene Police Department or that such

policies or customs caused the alleged violations of plaintiffs' constitutional rights.  Because this issue is common to all plaintiffs whom defendant moves against, and because there is no material difference between the plaintiffs requiring separate analysis, the issue will be dealt with jointly.[11]

Plaintiffs generally allege five City policies or customs led to the deprivations of their constitutional rights:

1.  A municipal policy, practice or custom of insufficient or non-existent supervision of police officers which created an atmosphere where officers could act with impunity and without oversight;

2.  A municipal policy, practice or custom of condoning sexual misconduct by police officers which created an atmosphere which made Magana/Lara's conduct of abuse possible or likely;

3.  A municipal policy, practice or custom of failing to receive, investigate and act on citizen complaints of sexual misconduct by City police officers;

4.  Final policymakers knowingly covered up officer Magana's pre-employment criminal history in order to fulfill minority quotas and bring diversity to the Eugene Police Department by hiring Magana; and

5.  The Eugene Police Department had deficient internal affairs policies which led to and otherwise contributed to Magana and Lara's sexual abuse of women.

I do not accept plaintiffs' allegations that because final policymakers allegedly covered up Magana's criminal history when hiring him - a history consisting of a juvenile burglary and an uncharged burglary arrest twelve years prior - that such constituted a custom or policy that was the moving force behind Magana and Lara's subsequent unconstitutional actions against women.  Nor do I agree that

---

[11]The parties all rely generally on the alleged policies and customs raised by plaintiff Dunn in her response.  Additionally, beyond the policies or customs of concern to all plaintiffs, plaintiff Dunn has argued an additional policy or custom of failing to adequately deal with complaints and concerns raised by members of the public suffering from mental illness or disability.  However, this issue need not be decided at present, because defendant's motion for summary judgment on Monell grounds is denied on other bases, as described below.

the police department in general lacked an effective internal affairs ("IA") department.  The record demonstrates that, generally speaking, IA reports were taken, screened, investigated, and acted upon efficiently and effectively, and that annual audits were conducted of the IA system to ensure it was working appropriately.  Indeed, these audits, when completed, were distributed to policymakers and shared with the Chief of Police, who examined them and discussed them with the auditor.  I do not find that a policy or custom of a general internal affairs deficiency led to Magana and Lara's acts.

With regard to the three remaining policies, plaintiffs do not seriously contend that these were affirmative policies in place, i.e., that a policymaker such as the Chief of Police issued formal policies directing that complaints of sexual assault by officers be disregarded, or that officers be allowed to operate unsupervised and undirected.  The contention is, rather, that the policies are policies of inaction or failure to act, i.e., that policymakers did not ensure that complaints of sexual assault by officers were investigated, or ensure that officers received adequate supervision.  However, Monell liability cannot be founded on negligence; rather, a municipality's failure to protect constitutional rights must result from "a conscious or deliberate choice among various alternatives." Berry v. Baca, 379 F.3d 764, 767 (9th Cir. 2004).  In order to impose liability based on a policy of deliberate inaction,

> [T]he plaintiff must establish:
>
> (1)    that he possessed a constitutional right of which he was deprived;
>
> (2)    that the municipality had a policy;
>
> (3)    that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and
>
> (4)    that the policy [was] the moving force behind the constitutional violation.

15 - OPINION AND ORDER

Oviatt v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992)(quoting City of Canton v. Harris, 489 U.S. 378

(1989)(internal quote marks omitted).

There is no question that the plaintiffs had a constitutional right to be free from sexual

assaults committed by police officers using their position as leverage in the assaults. However,

defendant vigorously argues that plaintiff have not provided any evidence as to the existence of the

alleged policies.

I disagree. Although the policies alleged are, of course, unwritten, an appropriate test has

been fashioned to analyze whether an unwritten policy has been established that can lead to Monell

liability. The Sixth Circuit, in Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005),

recently determined that in cases where inaction based on an unwritten policy of inaction is alleged,

plaintiffs must show:

(1)    The existence of a clear and persistent pattern of [illegal activity];

(2)    Notice or constructive notice on the part of the [policymaking official];

(3)    The [policymaking official's] tacit approval of the unconstitutional conduct, such that their deliberate indifference to their failure to act can be said to amount to an official policy of inaction; and

(4)    That the [policymaking official's] custom was the moving force or direct causal link in the constitutional deprivation.

Defendant concedes that there is evidence of a clear and persistent pattern of illegal activity.

However, they argue that there is no evidence from which a factfinder could determine that the

policymaking official, i.e. the Chief of Police, had notice or constructive notice of the activity. This

contention is inaccurate. It is a question of fact whether any of the Chiefs of Police had actual

knowledge of complaints about sexual assaults by City of Eugene police officers. Moreover, it is

16 - OPINION AND ORDER

clear that by April 2002 Chief Buchanan was aware of a June 1, 2001 complaint made by Jessica

Dean to the Eugene Police Department about the behavior of Magana. That complaint alleged that

on May 31, 2001, Magana, while on patrol, stopped Dean early in the morning, began asking her

personal questions, and offered that he was going to be off work for the next several days. Dean felt

the questions and statements were inappropriate, and complained to the department. Sergeant Harris

of the EPD investigated, and noted that Magana did not report the field stop as he should have, ran

no records check even though he told the investigators that he stopped her for possible prostitution

activity or outstanding warrants, and that he claimed that his failure to report the stop or run a

records check was due to heavy radio traffic when in fact radio traffic was exceptionally light.

Magana also denied telling Dean that he would be off work for the next several days, although he

was, in fact, scheduled to be off duty during that time and there was no other conceivable way Dean

would have known that. At the conclusion of the investigation, IA did not sustain the allegations,

although it was noted  that Magana's explanations were suspicious.  Ultimately, this case was

reviewed by the IA auditor, who then brought it up with the Chief of Police as part of his audit

report.  In his deposition, Chief Buchanan testified that:

> Q.     Do you recall discussing a complaint against Officer Magana in that meeting
>        with [IA auditor] Lankford?
>
> A.     Yes.
>
> Q.     . . . What did you understand the purpose of this meeting with Mr. Lankford
>        was?
>
> A.     Well, the purpose of Mr. Lankford's contract, which is basically the purpose
>        of the meeting, is to review a sampling of IA cases and look at them for - in
>        terms of completeness, thoroughness, whether or not discipline was
>        consistent, and, I guess to sort of sum things up, to basically evaluate how
>        well we were doing our internal investigations.

17 - OPINION AND ORDER

Q.    And this first meeting, them, with Mr. Lankford was the end of his first evaluation of your process. Is that correct?

A.    Yes.

Q.    Did you have any concerns about any of the cases that Mr. Lankford reviewed when you discussed it with him?

A.    No. This particular case - you know, we were sitting in the room reviewing this, and he - all the cases that he looked at are sitting there in a cardboard box. I did not pull out this particular case and look at it in front of him. I went back and reviewed it later. And I could see - I understand his concern.

Q.    You were pointing to Case No. 029?

A.    029 involving Roger Magana investigated by Sergeant Harris, yes.

Q.    Did you pull out any other cases besides the Magana case?

A.    You know, I'm sure I did in the areas that he pointed out where we could improve. I think one of the recommendations that he made, either that year or the year after - I believe it was that first year - was that we should make some changes to our policy in the POM. And so, you know, I looked at that policy. So whatever - I'm sure that whatever areas he expressed concern I looked at. But I do specifically remember looking at this case.

Q.    Why do you specifically remember looking at 01029?

A.    Well, because of what came up later. I certainly remembered then that this had been - that this case was out there and it was one that Howell Lankford had pointed out. But I think I also remembered it just from the fact that I looked at it. And I understood his concern.

Q.    "His" being Mr. Lankford's concern?

A.    Mr. Lankford's concern in that there was reason there to question what Officer Magana had said.

Q.    And I'm just going to ask some follow-up questions. There was reason to concern - to be concerned about what Officer Magana said, I think is the last thing you said. What do you mean by that?

A.    I think there was reason to doubt his side of the story versus the credibility of

the woman that filed the complaint. And this is, of course, from recollection. But my memory is that this woman somehow knew Officer Magana's work hours, basically his work schedule, and he is saying that he didn't provide that to her. And so the question for me, of course, is how did she know.

Q.    Do you think Officer Magana lied in this investigation?

A.    I didn't - I couldn't say for sure that he lied, but I thought there was reason to question what he said.

Q.    And if you believed there was reason to question what he said, did you consider initiating a new investigation of Officer Magana?

A.    No, because we could not.

Q.    Why?

A.    Because of our agreement with the union and double jeopardy issues around this.

. . .

Q.    What if - Let's use the 029 case from Mr. Lankford's report here. The allegations were unbecoming conduct, personal questions of a female, not sustained. And in the course of the investigation, both you and Mr. Lankford have questions about Mr. Magana's credibility. Is that not a new charge, untruthfulness?

A.    It could be. It could be.

Q.    Did you think about initiating a new investigation based on untruthfulness?

A.    I did not.

Q.    Do you know why you did not?

A.    It didn't occur to me.

Q.    Why?

A.    I wish I could tell you that.

Q.    Okay.

A.    Yeah. I mean, I've got to tell you, I wish we would have found out about

these guys a long time ago.

Q.    So, well, here's an opportunity in 029 to find out about them.  Did you take any steps to follow up on what Officer Magana was doing based on this report that you got?

A.    You know, I honestly don't recall what we did.  I don't recall if we went to his current supervisor at that time and said, Watch this guy.  I don't have any recollection of us doing that.  I couldn't tell you if we discussed it and the captain or the lieutenant did it.  I don't know.

Deposition of Thad Buchanan (#92, Excerpt 1) at 38-41, 46-48.  Chief Buchanan's deposition amply demonstrates that he had knowledge of at least one occasion where Magana had inappropriately questioned a female he stopped while on duty and in uniform, and then lied about it when investigated by IA.  He knew that nothing was done to Magana as a result of the IA investigation, and he did nothing to change that fact, either specifically - e.g., supervising Magana more closely - or generally - e.g., by changing the way IA investigations in such cases were handled.  And while defendant contends that there is no direct evidence that Buchanan knew of other issues, I believe a jury question exists as to what he, and the other Chiefs, knew or did not know at the time.[12]  In addition, one can reasonably infer some of the things he would have discovered in April 2002 had he ever asked if anything else had been reported about Magana in this regard, or would have known after April 2002 had he demanded that Magana be watched for such behavior:

_____

[12]Plaintiffs contend that the totality of the evidence regarding attitudes of sexual conduct of officers demonstrates a climate or culture that must be imputed to the Chiefs.  Because I rule that the Monell claims must go forward for trial, I need not specifically decide the applicability of the "longstanding practice or culture" cases cited by plaintiff in their briefing (Plaintiff's Dunn's Response (#74) at 33-34, incorporated by other plaintiffs).  However, in response to the breadth of material supplied by plaintiffs in their briefing, it is prudent to point out that at trial I will be vigilant in requiring that all evidence presented to the jury be relevant to the issues raised by these plaintiffs in their specific claims.  Books, magazine articles, and exposés about what has allegedly occurred in other police departments, or testimony about events that have occurred in the Eugene Police Department not relevant to these plaintiffs' claims, will not be permitted to go to the jury.

20 - OPINION AND ORDER

1)    Lisa Dunn, reporting to Officers Wolgamott, Bankhardt, Thompson, and Sgt. Fellman that Magana raped her;

2)    Theresa Bearden reporting to Officer Reimers that Magana grabbed her friend's buttocks;

3)    Lavera Salway reporting to Officer Poppy that she had been forced into having oral sex with Magana;

4)    Terri LaBox reporting to Sgt. Flynn that Magana had raped/sodomized her;

5)    Amy Wiggins reporting to Officer Webber and Lt. Fields that Janine Staten was having sex with Magana to "get out of warrants and stuff";

6)    Mercedes Kennedy, a police cadet and a minor, reporting to Officer Bremer, Sgt. Bills, and Lt. Seals that Magana was showing inappropriate romantic interest in her;

7)    Abra Lowe's mother reporting to the EPD that Magana was pressuring Lowe into a sexual relationship;

8)    An unknown woman believed to be a prostitute reporting to Officer Crompton that Magana was having a personal relationship with her and had sent other officers to quiet her about it;

9)    Officer Kara Bankhardt reporting to Officers Glemser and Curry that Magana came on to her while she was his recruit;

10)    Leslie Levenson reporting to Officer Reimer that "an officer" visited Lisa Dunn's apartment frequently;

11)    Megan Bell reporting to medical transport officers that she was raped by Magana;

12)    A Diablos nightclub bouncer yelling, in front of Officer Crompton, to Magana to stay away from his wife;

13)    Christine Coy asking Municipal Judge Wayne Allen in court, "How would you like it if a Eugene cop forced you to [give oral sex]?"

Whether or not the Chief had actual knowledge of this pattern of activities, the information was available via officers under his command. The June 1, 2001 complaint, which made its way to his

21 - OPINION AND ORDER

desk in April 2002 and gave him pause, was a red flag and presented an opportunity to discover the

pattern. That Chief Buchanan viewed the collective bargaining agreement with the police union to

be an obstacle to revisiting Magana's contact with Dean or even supervising Magana more closely

is not a justification for what can only be described as a deliberate choice of inaction. Constitutional

responsibilities trump bargaining agreements. Under these circumstances, a jury question exists as

to what knowledge, whether actual or constructive, the Chiefs can be fairly said to have had. As the

Fifth Circuit has noted:

> Knowledge of a continuing practice of city employees may be attributed to the
> [policymaker] in one of two ways. Actual knowledge may be shown by means such
> as discussions at council meetings or receipt of written information. Constructive
> knowledge may be attributed to the [policymaker] on the ground that it would have
> known of the violations if it had properly exercised its responsibilities, as, for
> example, where the violations were so persistent and widespread that they were the
> subject of prolonged public discussion or a high degree of publicity.

Bennett v. City of Slidell, 728 F.2d 762, 768 (5th Cir. 1984). Here, with a minimum of fourteen

reports of Magana's sexual misconduct, ranging from inappropriate comments to rape and sodomy,

at least one of which went to the Chief's desk where it was examined, considered, discussed, and

then ignored, there is sufficient evidence for a jury to conclude that the Chief of Police knew, or

would have known had he properly exercised his responsibilities, of a continuing practice of illegal

conduct.

Further, there is sufficient evidence for a jury to conclude that the Chief's response, or lack

thereof, was deliberately indifferent to the constitutional rights of the women assaulted by Magana

and Lara. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal

[policymaker] disregarded a known or obvious consequence of his actions." Board of

Commissioners of Bryan County, OK, v. Brown, 520 U.S. 397, 410 (1997). "This occurs when the

need for more or different action 'is so obvious, and the inadequacy [of the current policy] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." Oviatt, supra, at 1477-78 (quoting City of Canton, supra at 390). When the Chief learned in April 2002 of Magana's stop of Dean, and everyone from the IA investigator, to the auditor, to the Chief himself believed Magana was probably lying about what happened, the need for more or different action was obvious, as the existent policy of dealing with the supervision of officers and the handling of reports of sexual misconduct was clearly likely to result in the violation of someone's constitutional rights. Although defendant alleges that the Chief could not have known from the Dean report the ultimate extent of Magana and Lara's activities, and that they were going to deprive women of their rights to be free from sexual assault from officers, it is quite clear that the Chief was aware that Magana was likely stopping Dean without a reasonable basis to do so, which is a constitutional violation itself. Further, a factfinder could reasonably conclude that an obvious possible conclusion of these sorts of stops would carry into the realm of sexual assault. A police officer who "hits" on women he encounters while on duty and lies about his conduct is a flagrant and transparent concern. At a minimum, the incident should have alerted the Chief to the need for greater supervision of Magana's contacts with women while on patrol. In sum, a factfinder could find that the Chiefs' collective failure to do anything, even after Buchanan learned of the Dean incident, constituted deliberate indifference.

Finally, it is an easy call that whether such deliberate indifference was a causal factor in causing plaintiffs' constitutional injuries is a jury question. If the jury concludes that policymakers were deliberately indifferent in their failure to act to protect plaintiffs' constitutional rights and that such amounted to an official policy or custom of inaction, that jury could conclude that such policy

23 - OPINION AND ORDER

of inaction was a direct causal link in causing the injuries.

For the above reasons, defendant's motion for summary judgment on plaintiffs' claims alleging Monell liability against the City is denied.

## II.    Plaintiffs' state law claims

### A.    Oregon Tort Claims Act issues

Defendant asserts that several of plaintiffs' state law claims must be dismissed for want of timely filing of tort claim notices as required by the Oregon Tort Claims Act at ORS 30.275. This provision of the OTCA requires injured parties to notify the municipality of their intent to sue within 180 days of the alleged injury (with a possible 90 day extension due to incapacity). As described more fully above, the court will employ the test for equitably tolling the OTCA notice period described in J.S. v. City of Eugene, supra.

### 1.    M.N.O.

Plaintiff M.N.O. filed her tort claim notice on December 15, 2003. As such, defendant argues that all state law claims based on actions taken by Magana prior to June 15, 2003 are barred by the OTCA 180-day notice provision.

As described above, Magana's actions towards M.N.O., if proven, constituted a direct threat to her safety warranting tolling the OTCA notice period. As she filed her OTCA notice within a reasonable period after the threat from Magana was removed, a reasonable jury could consider her OTCA notice to be timely filed.

Additionally, although defendant argues that her notice was deficient as to the complete date range of the occurrences now alleged, I find that she substantially complied with the notice requirement in that she advised defendant of the nature of the claims and gave the approximate date

24 - OPINION AND ORDER

range. I do not consider the City prejudiced in its investigation of these matters due to her failure to precisely delineate the specific dates of the alleged assaults.

## 2. <u>Dunn</u>

Plaintiff Dunn never filed a formal tort claim notice with the City. As such, defendant argues that all state law claims against it are barred by the OTCA notice requirement.

The relevant provision of the OTCA, ORS 30.275, states that:

(1)    No action arising from any act or omission of a public body or an officer, employee or agent of a public body . . . shall be maintained unless notice of claim is given as required by this section.
. . .
(3)    Notice of claim required by this section is satisfied by:

    (a)    Formal notice of claim as provided in subsections (4) and (5) of this section;

    (b)    Actual notice of claim as provided in subsection (6) of this section;
. . .
(4)    Formal notice of claim is a written communication from a claimant or representative of a claimant containing:

    (a)    A statement that a claim for damages is or will be asserted against the public body or an officer, employee or agent of the public body;

    (b)    A description of the time, place and circumstances giving rise to the claim, so far as known to the claimant; and

    (c)    The name of the claimant and the mailing address to which correspondence concerning the claim may be sent.

(5)    Formal notice of claim shall be given by mail or personal delivery:
. . .
    (b)    If the claim is against a local public body or an officer, employee or agent thereof, to the public body at its principal administrative office, to any member of the governing body of the public body, or to an attorney designated by the governing body as its general counsel.

(6)    Actual notice of claim is any communication by which any individual to

whom notice may be given as provided in subsection (5) of this section or any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body. A person responsible for administering tort claims on behalf of a public body is a person who, acting within the scope of the person's responsibility, as an officer, employee or agent of a public body or as an employee or agent of an insurance carrier insuring the public body for risks within the scope of ORS 30.260 to 30.300, engages in investigation, negotiation, adjustment or defense of claims within the scope of ORS 30.260 to 30.300, or in furnishing or accepting forms for claimants to provide claim information, or in supervising any of those activities.

It is undisputed that Dunn did not file a formal OTCA notice with the City. However, she argues that her frequent statements to different City officials about Magana's conduct suffices to constitute actual notice.

On the record before me, I cannot say that any of Dunn's statements adequately met the requirements set forth by ORS 30.275(6). Although she has provided evidence that she told various police officers about what Magana was doing, said police officers were not members of the governing body of the city, general counsel for the city, or risk managers for the city. And although she asserts that she informed "the Mayor's office," it is far from clear that any city officials who could reasonably be said to constitute appropriate employees working at the principal administrative office were made aware of the specific nature of the claims now made and of Dunn's intent to initiate a lawsuit over them. However, although plaintiff bears the burden of proof on this matter (see ORS 30.275(7), I feel that the better course at this juncture is to defer ruling on this question until the close of evidence at trial. Given the number of statements that were allegedly made by Dunn to various individuals, some of which were made to City employees at City Hall, it is not unfathomable

26 - OPINION AND ORDER

that some authorized individual - a member of the City Council, a risk manager, or a city attorney, for example - was made aware of the substance of Dunn's claims and should have reasonably inferred an intent to sue. I will allow Dunn to make a showing at trial that some such individual actually did have such notice. If, at the close of evidence, defendant believes that Dunn has failed to make this showing, it can renew its motion for summary judgment on OTCA grounds at that time.

### 3.    **J.E.B.**

Plaintiff J.E.B. filed her tort claim notice on September 26, 2003. As such, defendant argues that J.E.B.'s state law claim based on actions taken by Magana on October 17, 2001 is barred by the OTCA 180-day notice provision.

As described above, I agree with defendant. The evidence does not support a finding that Magana directly threatened J.E.B. in such as way as to warrant tolling the OTCA notice provision. As such, summary judgment on J.E.B.'s state law claim based on the October 17, 2001 incident is granted in favor of defendant.

### 4.    **T.L.L.**

Plaintiff T.L.L. brings claims based on events that allegedly occurred on May 15, 2002 and June 10, 2003. T.L.L. filed her tort claim notice on September 26, 2003. As such, defendant argues that T.L.L.'s state law claim based on actions taken by Magana on May 15, 2002 is barred by the OTCA 180-day notice provision.

I agree with defendant. T.L.L. alleges that Magana told her not to make any "noise" about what he had done and that he would "get back" at her if she told anyone, and such could constitute the direct threat to her safety that would warrant tolling the OTCA notice provision. However, I note that a year later, when Magana allegedly returned to her residence and assaulted her again, she notes

27 - OPINION AND ORDER

that she called EPD "as soon as he left," although she notes that she remained in fear of him at that time and beyond. Again, as noted previously in the analysis of the timeliness of Dunn's § 1983 claims, it is not enough to show that threats were made - plaintiff must also show that she did not file the claims because of the threat. Thus, assuming that that Magana's threats were sufficient to warrant equitable tolling, the fact that she reported the subsequent assault immediately undermines her contention that her failure to file a timely tort claim notice regarding the May 15, 2002 assault was due to a fear created by those threats. For these reasons, summary judgment on T.L.L.'s state law claim based on the May 15, 2002 incident is granted in favor of defendant.

### 5.    S.A.L.

Plaintiff S.A.L. brings claims based on events that allegedly occurred between September 2002 and May 2003. S.A.L. filed her tort claim notice on March 19, 2004. As such, defendant argues that all of S.A.L.'s state law claims are barred by the OTCA 180-day notice provision.

I agree with defendant. S.A.L. has provided no evidence of threats of the sort that would warrant equitable tolling. Although she states that Lara was "angry" on one occasion and threatened to take her to jail, and promised on another occasion to keep her out of trouble if she would "work with him," these statements not sufficient to constitute threats to her physical safety. However, even were she able to establish threats sufficient to warrant tolling, she would nonetheless not be entitled to it because of the unreasonable amount of time that elapsed after the removal of the purported threat before she filed her tort claim notice. Although Lara was arrested on August 5, 2003, S.A.L. did not file her claim notice until March 19, 2004, approximately 227 days later. Even assuming, arguendo, that the 180-day OTCA notice clock should be construed as starting on the date of Lara's arrest, therefore, her notice was untimely. This delay is unreasonable, and negates her ability to seek

equitable estoppel. For these reasons, summary judgment on all of S.A.L.'s state law claims is granted in favor of defendant.

### B.    Statutes of limitations issues

The statute of limitations for bringing a tort based on the act or omission of a public body or employee of that public body is two years from the date of the alleged injury. ORS 30.275(9). Defendant argues that some of plaintiffs' state law claims are barred by this two year statute of limitations.

Plaintiffs' arguments against application of the statute again comprise a plea for equitable estoppel. I believe that the standard set out by J.S. v. City of Eugene, applied above to plaintiffs' equitable estoppel arguments regarding the two year § 1983 statute of limitations, is appropriate to apply to the question of whether estoppel is warranted on their state law claims as well

### 1.    M.N.O.

Plaintiff M.N.O. filed her suit on December 16, 2003. Defendant thus argues that M.N.O.'s state law claims based on actions taken by Magana prior to December 16, 2001 are barred by the statute of limitations.

For the reasons described above related to her § 1983 claims, I disagree with defendant and find that equitable estoppel may apply. As such, the City is precluded from asserting the two-year statute of limitations on M.N.O.'s state law claims at the summary judgment stage.

### 2.    Dunn

Plaintiff Dunn filed her suit on July 27, 2004, and was granted leave to file an amended petition on March 10, 2005. In this amended complaint, plaintiff alleges various claims brought under state law that were not specifically alleged in her original complaint. Defendant argues that

29 - OPINION AND ORDER

because the amended complaint is the first pleading in which Dunn asserted state law claims, she

is barred by the statute of limitations from maintaining any claims accruing prior to March 10, 2003.

I disagree. Federal Rule of Civil Procedure 15(c) provides, in relevant part, that:

An amendment of a pleading relates back to the date of the original pleading when:

. . .

> (2)    the claim or defense asserted in the amended pleading arose out of the
> conduct, transaction, or occurrence set forth or attempted to be set
> forth in the original pleading[.]

Here, plaintiff's original filing brought claims against Magana and the City under federal law based

on the same conduct and occurrences as asserted in her state law claims against Magana and the City.

As such, the new claims in the amended complaint relate back to the date of the initial filing.[13]

### 3.    J.E.B.

Plaintiff J.E.B. filed her suit on January 9, 2004. As such, defendant argues that J.E.B.'s state

law claim based on actions taken by Magana in October 2001 is barred by the statute of limitations.

For the reasons described above related to her § 1983 claim, I agree with defendant.

Summary judgment on J.E.B.'s state law claim related to the October 2001 occurrence is granted in

favor of defendant.

### C.    Municipal liability

Defendant argues that it is entitled to summary judgment on all plaintiffs' state law claims

because the tortfeasors, Magana and Lara, were acting outside the scope of their employment and

are not eligible for defense or indemnification from the City because their actions constituted

---

[13]Dunn also argues that she is entitled to tolling based on ORS 12.160, which provides for
a five-year tolling in the case of insanity. This argument is not well taken, as the statute of
limitations applicable to this action stems from ORS 30.275(9), which excludes from application the
provisions of ORS Chapter 12. Regardless, I need not decide this issue at present. Should defendant
renew its motion at the close of evidence (see below), plaintiff may renew this argument.

malfeasance.

ORS 30.265(1) provides, in relevant part, that "every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of employment or duties[.]" In Chesterman v. Barmon, 305 Or. 439 (1988), the Oregon Supreme Court formulated a three-part test for purposes of analyzing whether an employee was acting in the scope of employment. According to Chesterman, the factors a court is to consider are (1) whether the act occurred substantially within the time and place limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform. Id. at 442. Defendant argues that because the actions of Magana and Lara leading to plaintiff's asserted injuries were not committed out of any motivation to serve the employer and were not of a kind which Magana and Lara were hired to perform, it is a simple thing to find that they were acting outside the scope of their employment.

However, in 1999 the Oregon Supreme Court issued two opinions - Fearing v. Bucher, 328 Or. 367 (1999) and Lourim v. Swensen, 328 Or. 380 (1999) - and the Oregon Court of Appeals published a third - Barrington ex rel Barrington v. Sandberg, 164 Or.App. 292 (1999) - which somewhat altered the scope of employment analysis in intentional tort cases.

In Fearing, the court concluded that the Archdiocese of Portland could be liable for a priest's sexual molestation of a young boy, because it could be found that the priest was acting within the scope of his employment. The court noted that:

> As in Chesterman, Bucher's alleged sexual assaults on plaintiff clearly were outside the scope of his employment, but our inquiry does not end there. The Archdiocese still could be found vicariously liable, if acts that were within Bucher's scope of

31 - OPINION AND ORDER

employment resulted in the acts which led to injury to plaintiff.

Whether an employee has acted within the scope of employment at any given time generally is a question for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the facts pled. In the context of the present case, where, like Chesterman, the employer's vicarious liability arises out of the employee's commission of an intentional tort, we must consider whether the allegations contained in the amended complaint state ultimate facts sufficient to establish that acts that were within Bucher's scope of employment resulted in the acts that caused injury to plaintiff.

Id. at 374 (citations and quote marks omitted). Similarly, in Lourim, the court found that sexual assaults committed by a Boy Scout leader might be found to be in the scope of employment where "a jury reasonably could infer that the sexual assaults were merely the culmination of a progressive series of actions that involved the ordinary and authorized duties of a Boy Scout leader." Id. at 386. Further, the court noted, "[a] jury also reasonably could infer that Swensen's performance of his duties as troop leader with respect to plaintiff and his family was a necessary precursor to the sexual abuse and that the assaults were a direct outgrowth of and were engendered by conduct that was within the scope of Swensen's employment." Id. at 386-87.

Even more persuasive is the decision from the Oregon Court of Appeals in Barrington. In that case, the parents of a minor Explorer Scout police cadet sued the City of North Bend, alleging that one of its police officers had engaged in inappropriate sexual contact with their daughter resulting in emotional distress. The City argued that such actions were taken outside the scope of employment; however, the Court of Appeals, citing Fearing and Lourim, disagreed:

The essential point is that the performance of the employee's duties must be a necessary precursor to the misconduct and that the misconduct must be a direct outgrowth of, and have been engendered by, conduct that was within the scope of the employee's employment. It is not necessary that the misconduct itself be of a kind that the employer hired the employee to perform. The evidence in this case is sufficient to permit the jury to find that Sandberg's work as supervisor of the police

32 - OPINION AND ORDER

cadets was a necessary precursor to the misconduct and that the misconduct was a direct outgrowth of that work. All but one of the incidents occurred while Sandberg was performing his official duties of supervising the police cadets; the other incident occurred during a skiing trip that Sandberg planned for the cadets. The trial court did not err in submitting the case to the jury.

Id. at 295-96.

These cases, as in the cases presently before the court, are distinguishable from similar cases in which a tortfeasor was not found to be in the scope of employment in that these tortfeasors were not simply put in contact with the victims because of their position but actively used their positions to make the misconduct possible. Based on the Fearing, Lourim, and Barrington cases, and the record before the court, I cannot say that as a matter of law Magana and Lara were acting outside the scope of their employment when they committed the sexual assaults alleged by plaintiffs. That question is one which must be decided by a jury.

Defendant also argues that Magana and Lara are not eligible for defense and indemnification, and therefore pursuant to ORS 30.265(1) the city cannot be held liable for their torts.

The relevant portion of ORS 30.265(1) provides that "[t]he sole cause of action for any tort of officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for defense and indemnification under ORS 30.285 or 30.287 shall be an action against the public body alone." ORS 30.285 provides that:

(1)     The governing body of any public body shall defend, save harmless and indemnify any of its officers, employees and agents . . . against any tort claim or demand . . . arising out of an alleged act or omission occurring in the performance of duty.

(2)     The provisions of subsection (1) of this section do not apply in cases of malfeasance in office or willful or wanton neglect of duty.

33 - OPINION AND ORDER

ORS 30.287(1), in turn, provides that:

> If any civil action, suit or proceeding is brought against any officer, employee, or
> agent of a local public body other than the state which on its face falls within the
> provisions of ORS 30.285 or which officer, employee or agent asserts to be based in
> fact upon an alleged act or omission in the performance of duty, the officer, employee
> or agent may file a written request for counsel with the governing body of the public
> body. The governing body shall thereupon engage counsel to appear and defend the
> officer, employee or agent unless after investigation it is determined that the claim
> or demand does not arise out of an alleged act or omission occurring in the
> performance of duty, or that the act or omission complaint of amounted to
> malfeasance in office of willful or wanton neglect of duty in which case the
> governing body shall reject defense of the claim.

Defendant argues that because Magana and Lara's conduct constitutes malfeasance under ORS

30.285(2) and ORS 30.287(1), they are not eligible for defense and indemnification, and as such the

City cannot be held liable for their actions on plaintiffs' state law claims.

Several points must be made here. First and foremost, it is unclear why, if defendant's

argument carries the day, there is such an absence of Oregon caselaw dismissing public bodies for

acts of malfeasance by their employees. Defendant itself was unable to point to a case on point, and

noted at oral argument that this was a matter of first impression. Yet given that this statute has been

in place as written for over fifteen years and there have been numerous cases involving intentional

torts committed by public officials - such as in <u>Barrington</u> - where such an argument would appear

to be as appropriate as here.

Regardless, I find that the statutory scheme does not clearly set forth what defendant asserts

it does, and cannot present a bar to municipal liability in this case. By its plain terms, ORS

30.265(1) has two components: first, it makes public bodies liable for the torts of their officers,

employees and agents acting within the scope of their duties. Second, it requires that the public body

shield such officers, employees or agents from liability for actions taken in the scope of their

34 - OPINION AND ORDER

employment and for which the public body must defend and indemnify the officers, employees or agents. These are not mutually exclusive. Rather, a valid interpretation of the statute would be that to the extent a public officer, employee or agent committed a tort in the scope of his employment but such tort constituted malfeasance, the victim could maintain its action against the public body (part one of the statute) and could also maintain the action against the officer, employee or agent, because the "hold harmless" provision (part two of the statute) would not apply. Although no Oregon court has interpreted this statute under similar circumstances, this interpretation makes the most logical sense based on the plain language of the statute, and squares with the cases in which public bodies have been found liable for the malfeasant torts of their employees. The inability of Magana and Lara to seek defense and indemnity from the City does not protect the City from liability pursuant to ORS 30.265.

### D.      Exclusivity of Remedies

Some plaintiffs have filed common law claims against the City under a theory of respondeat superior. However, these claims cannot be maintained, because the Oregon Tort Claims Act provides the exclusive vehicle for bringing tort claims against a municipality.

ORS 30.300 provides that the OTCA is "exclusive and supercedes all home rule charter provisions and conflicting laws and ordinances on the same subject." Similarly, ORS 30.320 provides, in relevant part, that "[a]n action may be maintained against [an incorporated city] for liability in tort only as provided in [the OTCA]." The OTCA, therefore, provides the exclusive vehicle for plaintiffs to bring their claims against the City. See, e.g., Weaver v. Lane County, 10 Or.App. 281, 291 (1972) ("This language is a clear indication of a legislative intent that as of the 1969 enactment a claim against a public body can only be brought under the government tort liability

law."). Plaintiffs cannot maintain their tort claims against the City other than through the OTCA. To the extent plaintiffs bring common law tort claims separate from their OTCA claims, or claims that fail to meet the requirements of the OTCA as described above, such claims must be dismissed.

### E.    Negligent Infliction of Emotional Distress - J.R.

Defendant argues that it is entitled to summary judgment on plaintiff J.R.'s claim for negligent infliction of emotional distress because she has not provided evidence from which a factfinder could conclude she suffered physical injury or that a special relationship existed between herself and Lara, the tortfeasor.

An individual who suffers physical injury due to the negligence of another is entitled to recover for mental distress which directly, and as a natural consequence, flows from the physical injury. Fehely v. Senders, 170 Or. 457, 461 (1943). With limited exceptions, however, a plaintiff may not recover for emotional injury alone. The Oregon Supreme Court has defined those exceptions as follows:

> First, where the defendant intended to inflict severe emotional distress. Second, where the defendant intended to do the painful act with knowledge that it will cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself. Third, where the defendant's conduct infringed on some legally protected interest apart from causing the claimed distress, even when that conduct was only negligent.

Hammond v. Central Lane Communications Center, 312 Or. 17, 22-23 (1991).

I find that in this instance there is sufficient evidence in the record from which a jury could conclude that one of exceptions described above applies to allow J.R. to recover for emotional distress. The statements to Officer McKee during the investigation, along with her deposition testimony and her testimony at Lara's trial, are enough to allow a reasonable jury to determine that

36 - OPINION AND ORDER

Lara intended to commit the alleged sexual assault and that the alleged assault occurred as a result of Lara using his position as a police officer to intimidate J.R. and prevent her from avoiding the encounter. Although police may not generally have a duty to protect the public sufficient to constitute a "special relationship," Nearing v. Weaver, 295 Or. 702, 706 (1983), surely the use of state authority to intimidate and detain an individual as a precursor to assault constitutes a jury question on whether "defendant's position in relation to the plaintiff involv[ed] some responsibility aside from the tort itself[.]" Defendant's motion for summary judgment on this claim is denied.

### F.   Negligent Supervision - J.R.

Defendant argues that J.R. has not provided sufficient evidence to allow a reasonable factfinder to conclude that the City was negligent in its supervision of Lara in any of the particulars claimed. I disagree.

To prove a claim for negligent supervision, a plaintiff must establish a special relationship between the defendant and the tortfeasor, Buchler v. Oregon Corrections Division, 316 Or. 499, 505 (1993), and that the risk of harm encountered was reasonably foreseeable to the defendant in the event of its negligence. Whalen v. Albertsons, Inc., 129 Or.App. 501, 506-07 (1994). The key issue is whether, in light of what defendant knew or should have known about the tortfeasor, the defendant could reasonably foresee that the tortfeasor, if inadequately supervised, would engage in the kind of conduct that ultimately harmed the plaintiff. Washa v. Department of Corrections, 150 Or.App. 207, 225 (1999).

An employment relationship is a "special relationship" between the defendant employer and the tortfeasor Whelan, 129 Or.App. at 505. The sole inquiry here, therefore, is the question of foreseeability. As noted by the Oregon Court of Appeals, this sort of inquiry "generally presents an

issue of fact, and, therefore, is not a likely candidate for summary judgment." <u>Cunningham v. Happy Palace, Inc.</u>, 157 Or.App. 334, 337 (1998). Given the alleged policies and customs described earlier and the information Chief Buchanan possessed about at least one officer's conduct, I find that sufficient evidence exists to allow a reasonable jury to conclude that it was foreseeable that EPD officers would engage in misconduct of the sort alleged by J.R. Defendant's motion for summary judgment on this claim is denied.

## III.    Trial Consolidation

As I mentioned to the parties at oral argument, it is my considered determination that consolidating these cases for purposes of trial is appropriate. However, while there are some shared issue, I believe there are significant reasons to split the cases along the lines of the individual defendants. Therefore, it will be the order of the court that all cases against the City and Magana will be tried together in one proceeding, and all cases against the City and Lara will be tried together in a separate proceeding. The case of J.R. v. City of Eugene, with no named individual defendant, will be tried in the Lara proceeding, as J.R.'s claims stem from his alleged conduct. All counsel in these actions will be contacted in the next weeks to set a time for a telephone scheduling conference in which appropriate trial schedules can be set, and the parties will be heard regarding which consolidated proceeding should be tried first.

## IV.    Other issues

Numerous other issues have been brought before the court. Various plaintiffs, and defendant, have brought motions (04-1021-TC ##69, 106 and 137; 04-6443-TC #38) to strike affidavits, depositions, exhibits, or other materials from consideration. These motions will be denied, although the parties may object at trial to objectionable material being introduced into evidence. Plaintiff

38 - OPINION AND ORDER

Dunn has moved (04-1021-TC # 114) that various deposition excerpts filed under seal be unsealed and placed in the public record. That motion is denied. Plaintiff Dunn has moved (04-1021-TC ##134 and 135) to substitute corrected and redacted briefing and supporting materials. Those motions are granted. Defendant has moved (04-6018-TC # 57) to compel discovery related to plaintiff T.L.L.'s claims. The motion is moot as to Salem Memorial Hospital. However, the motion is well taken as to the Social Security disability records and the records of the mental health office newly identified by plaintiff. Plaintiff T.L.L. is ordered to produce relevant records from those sources to defendant within a reasonable period after she receives them.

## CONCLUSION

Defendant's motions (03-6393-TC #45; 04-1021-TC ##37 and 83; 04-6017-TC #40; 04-6018-TC #40; 04-6183-TC #36; 04-6443-TC #28) and supplemental motion (04-6183-TC #69) for summary judgment are granted in part and denied in part as described above. Plaintiff Dunn's motion (04-1021-TC #46) for summary judgment is denied. The cases will be tried in two proceedings, one involving all claims against the City and Lara, and one involving all claims against the City and Magana. All remaining motions on other issues are disposed of as described above.

DATED this 6 day of March, 2006.

Thomas M. Coffin
United States Magistrate Judge

39 - OPINION AND ORDER